# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 25, 2011 Session

## STATE OF TENNESSEE  v.  CHESNEY CHEYENNE BOWLING

### Appeal from the Criminal Court for Sullivan County
### Nos.  58652, 56655      R. Jerry Beck, Judge

### No.  E2011-00928-CCA-R3-CD Filed May 2, 2012

The Defendant, Chesney Cheyenne Bowling, was sentenced by agreement to consecutive sentences of three and one-half years and eleven months and twenty-nine days following her plea of guilty to various drug-related offenses.  It is from the trial court's denial of alternative sentencing that the Defendant appeals.  Specifically, the Defendant argues that the trial court attributed excessive weight to her criminal history while not attributing sufficient weight to proof she offered in mitigation. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. JERRY L. SMITH, J., not participating.

Richard A. Spivey, Kingsport, Tennessee, for the appellant, Chesney Cheyenne Bowling.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Joseph E. Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On August 4, 2009, the Defendant was charged by presentment for offenses which resulted from a traffic stop and subsequent search of her hotel room on May 24, 2009.  The offenses included one count of possession with the intent to sell or deliver cocaine, less than

.5 grams; one count of possession with the intent to sell or deliver alprazolam; one count of simple possession of marijuana; one count of simple possession of benzylpiperazine; one count of possession of drug paraphernalia; and one count of maintaining a dwelling used for keeping or selling controlled substances. On April 20, 2010, the Defendant filed a motion to suppress the evidence found during the May 24, 2009 incident, but the motion was later withdrawn at the plea hearing.

On November 18, 2010, the Defendant executed a waiver of indictment or presentment of the grand jury and agreed to be charged by information for several new offenses she had committed while on bond. The new charges were acquired on May 14, 2010, and included one count of simple possession of cocaine, one count of simple possession of buprenorphine, one count of simple possession of alprazolam, one count of possession of drug paraphernalia, and one count of simple possession of oxycodone. Also on November 18, 2010, the Defendant submitted her request for acceptance of a guilty plea and waiver of rights, pleading guilty to all six counts in the presentment and all five counts charged by information.

*I. Guilty Plea Hearing*

At the November 18, 2010 guilty plea hearing, the State outlined the facts supporting the Defendant's guilty pleas. Regarding the charges occurring on May 24, 2009, the State submitted the following facts:

On May the 24th of 2009 at approximately 4:20 in the morning, Trooper David Osborne was in a stationary position on Interstate 26 when a black GMC Yukon passed his location. Trooper Osborne was able to, with the use of his radar equipment, determine that the vehicle's speed was 89 miles an hour in a 55 mile-an-hour zone.

Trooper Osborne had noticed that the GMC took off at the Wilcox exit, and Trooper Osborne at this point in time proceeded to follow the Yukon. And as he followed the Yukon, he noticed the Yukon change lanes several times, though there was no other traffic on the roadway at that hour of the morning that would justify it — the vehicle's actions.

Based upon the fact that the vehicle was in excess of the posted speed limit, as well as some of the other observations made by Trooper Osborne, he stopped the vehicle and identified Mr. Bennett as the driver and Ms. Bowling as the front seat passenger. He immediately detected the odor of alcohol as well as the odor of burnt marijuana coming from the vehicle.

He spoke to Mr. Bennett, and Mr. Bennett admitted that he had been drinking several beers earlier in the evening. When asked to produce a driver's license, Mr. Bennett only produced an ID, and it was later determined that in fact Mr. Bennett's driver's license . . . was revoked.

At some point in time he spoke to — he asked first for Mr. Bennett to step out of the vehicle, and he talked to Mr. Bennett at length trying to determine if Mr. Bennett was in fact under the influence of alcohol or other intoxicants to the point of justifying the charge of driving under the influence. After performing several field sobriety tests, the trooper was satisfied that there was not a basis to charge him with DUI.

But trying to continue the investigation as to the odor of marijuana that he had smelled from the vehicle or smelled in the vehicle, the trooper then spoke to Ms. Bowling, who acknowledged that she was the owner of the vehicle. He told her that he had smelled marijuana in there. He asked her for consent to search the vehicle and she said that he could; that there was nothing in the vehicle. Mr. Bennett also was asked and gave consent for a search of the vehicle.

And the officer, in the course of searching the vehicle, found a set of digital scales with white residue in the center console which would be consistent with the use of the scales for the purposes of weighing controlled substances. He also found a marijuana cigarette that had been freshly smoked or had the presence of the indication that it had been recently smoked, as well as 12 to 14 pills in a plastic bag in a cigarette pack in the glove box.

The two of them were asked as to where they were coming from, where they were going. Ms. Bowling indicated that they were staying at the Days Inn. She was asked if there was anything illegal in the motel room. She indicated there was not, and upon being asked for a consent to search, she produced a key to the motel room and turned it over to the trooper.

The two of them were asked as far as who the motel room was registered to. Mr. Bennett said the hotel room was in his name. Ms. Bowling said that the hotel room was in her uncle's name.

Based upon all of the circumstances that the trooper found, as well as many inconsistencies, it was determined that the motel room would be searched and the Kingsport Police Department Patrol Division was asked to

assist Trooper Osborne, since he was occupied there at the site of the traffic stop.

. . . [P]olice officers with the Kingsport Police Department did in fact respond, got the hotel room key, and upon opening the door of the motel room that the two occupied, they found immediately in plain view green plant material believed to be marijuana loose on a table, along with a plastic Baggie, a pill crusher with marijuana on it, a blue pill that they believed to be Ecstasy, a razorblade, cigarette cellophane which appeared to contain marijuana seeds.

To the right of the doorway they observed a pack of razorblades that were laying on the coffee table, and on top of the microwave a tan-colored rock they believed to be crack cocaine. On the sink Sgt. Sean Chambers observed a box of baking soda, a plastic grocery bag containing white powder believed to be baking soda, a large measuring cup, and a plastic Baggie corner containing white residue . . . along with a metal whisk.

Cpl. Chambers, a former director of the Sullivan County Drug Task Force as well as a vice officer with many years of experience, would have tendered as a witness to testify to the process of taking powder cocaine, and the use of baking soda, microwave, and other ingredients to produce or make crack cocaine.

All of the items that were seized in the vehicle occupied by Mr. Bennett and Ms. Bowling were sent to the Tennessee Bureau of Investigation's crime laboratory, where an analysis by a forensic chemist with that agency made the determination that present among the exhibits tendered to the lab for analysis were cocaine base, a Schedule II controlled substance; marijuana, a Schedule VI controlled substance; a considerable number of alprazolam, a Schedule IV controlled substance; also benzylpiperazine, a Schedule I controlled substance which we refer to as Ecstasy.

. . . .

As part of the follow-up investigation, motel records regarding the room registration were obtained from the motel, and it was determined that a Mr. Larry Gilbert had rented the room. Mr. Gilbert was located and interviewed, and Mr. Gilbert would testify that he was familiar with Ms. Bowling and Mr. Bennett, knew them to be boyfriend and girlfriend. That he had rented a number of rooms for them in the past since they were from

-4-

Knoxville. That he was personally familiar or aware of the fact that they would rent rooms for the purposes of being in this area, and then would make trips from the room and sell cocaine.

On this particular occasion they gave him money to rent the room and to put the room under his name. Upon renting the room, he was given a small piece of cocaine which he used in the room. He also would have testified that he has been present when the two of them have gone through the process of converting powder cocaine to rock cocaine or crack cocaine base.

The motel room as well as the location of the traffic stop are within the county boundaries of Sullivan County.

Both the Defendant and her co-defendant agreed that the trial court could consider the stipulated facts above as a basis of the plea, despite their disagreement with some of the facts.

Regarding the information charges committed on May 14, 2010, the State outlined the following facts:

In that case, Your Honor, on May the 14th of 2010, patrol officers with the Kingsport Police Department received information regarding a narcotics complaint at a motel located at 700 Lynn Garden Drive, and specifically were directed to Room 204 which was occupied by Ms. Bowling and three other individuals.

. . . Ms. Bowling, as well as the other occupants, were advised of the complaint of narcotics being sold or used out of the room, and were coming out of the room, and were asked for consent for the officers to enter into the room, which all gave.

Upon entry into the room Amanda Lunsford asked for permission to search the room for narcotics, and again, all of the . . . occupants, including Ms. Bowling, agreed.

In the search of the room and of the occupants a number of controlled substances were located, as well as located [sic] was a box of Glad Sandwich Bags. The box of Glad Sandwich Bags had several bags in which the corners had been removed from the Baggies. The corners of Baggies is a commonly-used way of packaging smaller amounts of controlled substances. Also there were more Baggies with the ends cut off located in the trash can. As a result

-5-

of the presence of the drugs as well as the drug paraphernalia in the room, all of the occupants were arrested.

And in the course of searching Ms. Bowling, it was determined that Ms. Bowling had in her possession $984, despite the fact that she was unemployed.

The drugs that were taken from the room were sent to the Tennessee Bureau of Investigation's crime laboratory where Michael Bleakley, a forensic chemist who has testified as an expert in this court in the past, took the items submitted, analyzed them, and made the determination that among the controlled substances found in the room were buprenorphine, or what is commonly referred to as Suboxone, a Schedule III controlled substance; alprazolam, a Schedule IV controlled substance; oxycodone, a Schedule II controlled substance; and cocaine base, a Schedule II controlled substance.

The location of this motel room is again within the county boundaries of Sullivan County, Tennessee.

Again, the Defendant agreed that the trial court could consider the stipulated facts above as a basis for the plea, despite her disagreement with some of the facts.

Pursuant to the plea agreement, the Defendant agreed to serve three years and six months for the offenses charged by presentment and eleven months and twenty-nine days for the offenses charged by information. The sentences were to run consecutively, for an effective sentence of four years, five months and twenty-nine days. The manner of service was reserved for the trial court, and an alternative sentencing hearing was held on April 26, 2011.

*II. Alternative Sentencing Hearing*

The only evidence presented by the State at the alternative sentencing hearing was the Defendant's presentence report. The State opposed any form of alternative sentencing and argued that the Defendant should serve her time in confinement. The presentence report illustrated that the Defendant had several prior convictions, mostly for minor offenses.

After viewing the report, the trial court preliminarily noted that "[o]n the positive side, the Defendant obtained her GED in 2004 at Knox County Historic High." However, the court explained that the Defendant's prior record was a "[n]egative factor" and that it would consider the following prior convictions in determining whether alternative sentencing was appropriate: (1) driving with suspended license, 2010; (2) driving with suspended license,

2009; (3) driving while intoxicated (DWI), first offense, 2009; (4) possession of schedule IV drugs, 2009; (5) reckless driving, 2009; (6) assault, 2007; (7) driving under the influence (DUI), 2004; and (8) disorderly conduct, 2004.[1]

The Defendant testified on her own behalf at the alternative sentencing hearing. She testified that she had quit all of her drug use, except the occasional use of marijuana. The Defendant also testified that she was no longer selling or dealing drugs and had distanced herself from those who continued to sell or deal drugs. She explained that she wanted probation because she "would like to go to school, and continue taking care of [her] kids, because [she] is the only person they have." The Defendant reported that she was physically and sexually abused by her brother at a young age, and it caused her to enter into abusive relationships. She explained that she had not spoken with a counselor about her issues because she was not "able to come up with the money."

The Defendant admitted that her actions were wrong, but she explained that she was just "[b]eing a girlfriend and just going with the flow." When asked if she kept any of the money, the Defendant stated, "I have nothing from what I had. I have nothing. Because the one thing you know about the game, it's gone just as soon as you get it." In closing, the Defendant made the following statement to the court:

> Your Honor, I'm not the best person in the world. I'm not. And I have made mistakes. Please don't take me away from my babies. I'm all they have.

> And I know I messed up. Like I said, I know I messed up. But there's nothing I can do about it but try to correct my life from here. And this is the first serious trouble I've ever been in.

> I'm sorry. And all I'm asking is for you to please consider giving me probation. I'll do whatever it takes. I will. I just don't want to be took [sic] away from my babies.

On cross-examination, the Defendant admitted that she was required to go through alcohol and drug classes after one of her children tested positive for marijuana at birth. She also admitted that she was personally selling drugs with her co-defendant and that they "would come from Knoxville to Kingsport to sell drugs." The Defendant conceded that she

---

[1] The Defendant's presentence report incorrectly reflected an additional conviction for DUI. After verifying that the conviction was listed in error, the trial court went through each offense named in the Defendant's criminal history and noted which offenses listed therein it would consider in determining the appropriateness of an alternative sentence.

knew her co-defendant used the same man to rent rooms for him in exchange for the motel room price and cocaine. She agreed that her May 24, 2009 charges were acquired only nine days after she was convicted of possession of drugs, reckless driving, and driving on a suspended license. The Defendant also admitted that she committed the May 14, 2010 offenses while on bail for the May 24, 2009 offenses, and that she subsequently acquired an additional charge of driving on a suspended license in November of 2010.

After considering the evidence presented and the arguments of counsel, the trial court issued the following findings of fact in its denial of alternative sentencing:

> The Defendant in this case has a prior record. I'll not go through it. We've gone through it here on the record, and it's contained in the presentence report that's been marked as Exhibit 1.

> The Defendant is 24 years of age. She has been arrested, arrested, and arrested for something, whether you characterize it as major or minor. I don't see any hope it's going to change any.

> She talks about her children. But one of the children was born with marijuana in [its] blood system.

> She went to a drug treatment program. It obviously didn't do any good. My option after that: Well, send her to another drug treatment program [sic].

> She is not — there's nothing positive in her report except that she has two children, which I sympathize for. I sympathize for them two reasons; one, one of them was — came out positive for drugs. And she says she cares about them. I don't know about that.

> . . . I'm going to deny probation. That's for sure. And I'm going to deny relief under the Community Corrections special needs.

> Now, now I've got to do something with these children.

> . . . .

> She's 24, and I think she's using the children no more than just a shield, another way to get out of a problem she's in.

The Defendant orally requested the court to reconsider the eleven month and twenty-

nine day sentence on the offenses charged by information. The State opposed the motion, citing the need for finality, and the trial court agreed. The motion was denied, and the Defendant immediately filed her notice of appeal.

## ANALYSIS

The Defendant contends that the trial court erred in two ways in imposing her sentence: (1) attributing excessive weight to her criminal history, while failing to consider applicable mitigating factors in its determination of her sentence, and (2) denying alternative sentencing, specifically, probation and community corrections under the special needs provision. The Defendant argues that she is a favorable candidate for alternative sentencing, and her issues with drugs qualify her for admission into the Community Corrections Program under the special needs provision. The State responds that the record reflects that the trial court considered the appropriate sentencing principles and properly exercised its discretion in declining to grant community corrections.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. Because the 2005 amendments to the 1989 Sentencing Act rendered the sentencing guidelines merely advisory, the trial court is now free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]."State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008); See also Tenn. Code Ann. § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," id. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," id. § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," id. § 40-35-103(5). Carter, 254 S.W.3d at 343.

For the purpose of meaningful appellate review, the trial court is required to place on the record, either orally or in writing, what mitigating or enhancement factors were considered, if any, as well as its reasons for arriving at the final sentencing decision. Tenn. Code Ann. § 40-35-210(e); See also Carter, 254 S.W.3d at 343. Thus, if the trial court followed the statutory sentencing procedure and made findings of fact that are adequately supported in the record, this court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also Carter, 254 S.W.3d at 346. Should the record fail to demonstrate the required considerations by the trial court, then appellate review of the sentence is purely de novo. State v. Ashby, 823

S.W.2d 166, 169 (Tenn. 1991).

In conducting its de novo review, the appellate court must consider

(1) [t]he evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-13 and -14; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement that the defendant made on his own behalf.

Carter, 254 S.W.3d at 343; see also Tenn. Code Ann. §§ 40-35-113, -114, -210(b); Ashby, 823 S.W.2d at 168.

No defendant is entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347. However, a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary . . . . A court shall consider, but is not bound by, this advisory sentencing guideline[.]" Tenn. Code Ann. § 40-35-102(5), (6)(A) & (D); see Carter, 254 S.W.3d at 347.

The following considerations provide guidance regarding what constitutes "evidence to the contrary":
(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1); see also Carter, 254 S.W.3d 335, 347. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for

the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4).

It is well-settled that a defendant is only eligible for community corrections under the special needs provision if that defendant is also eligible for probation. See Tenn. Code Ann. § 40-36-106(c); see, e.g., State v. Johnson, 342 S.W.3d 520, 522 (Tenn. Crim. App. 2009); State v. Cowan, 40 S.W.3d 85, 86 (Tenn. Crim. App. 2000); State v. Kendrick, 10 S.W.3d 650, 655 (Tenn. Crim. App. 1999); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). A defendant is eligible for probation if the "sentence actually imposed [is] ten (10) years or less[,]" and the trial court is required to automatically consider probation as a sentencing option. Tenn. Code Ann. § 40-35-303(a), (b). A defendant's potential for rehabilitation or lack thereof should be examined when determining if an alternative sentence is appropriate. Tenn. Code Ann. § 40-35-103(5). A defendant seeking full probation bears the burden of showing that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" Carter, 254 S.W.3d at 347; State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting Hooper v. State, 201 Tenn. 156, 297 S.W.2d 78, 81 (Tenn. 1956)), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense, the defendant's criminal record, social history, and present condition, the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002); State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

The record reflects that the trial court properly considered the Defendant's request for alternative sentencing. Relative to its denial of full probation, the trial court expressed great concern over the Defendant's repeated involvement in the criminal justice system, and her previous failed attempt at drug treatment. Although the Defendant is statutorily eligible for probation, we cannot say that the court's decision to deny probation was in error. The court considered the appropriate sentencing principles and, implicitly[2], found that the Defendant's criminal history showed a disregard for society's laws and morals and that she had previously failed rehabilitation attempts. The court concluded that confinement was necessary because measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the Defendant. Thus, we conclude that the trial court properly denied probation in this case.

---

[2] Other panels of this court have reasoned that implicit findings were sufficient to fulfill the requirement under Dye and Bearden. See State v. Roderick Dean Hughes, E2009-00649-CCA-R3-CD, 2009 WL 3787251, at *4 (Tenn. Crim. App. Nov. 12, 2009), State v. Bernita Hogan, M2002-00808-CCA-R3-CD, 2003 WL 1787312, at *4-5 (Tenn. Crim. App. Apr. 4, 2003), perm. app. denied, (Tenn. Sept. 8, 2003).

As to the trial court's denial of community corrections, a defendant may qualify for community corrections based upon the special needs provision found at Tennessee Code Annotated section 40-36-106(c), which provides, in pertinent part:

> Felony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution, may be considered eligible for punishment in the community under this chapter.

Id.

The trial court failed to make any specific findings regarding the Defendant's suitability for community corrections and instead denied all forms of alternative sentencing in its ruling. Although defense counsel argued that the Defendant should be considered a candidate for community corrections under the special needs provision in light of her history of drug abuse, the court properly exercised its discretion in denying this alternative sentence. The trial court did preliminarily note that the Defendant had successfully completed probation in the past and that she had discontinued her use of all drugs, except the occasional use of marijuana. However, the Defendant did not testify that she was in need of treatment for drug addiction, nor does the record support such an assertion. The trial court's findings of fact clearly indicate a concern with the Defendant's potential for rehabilitation and likelihood to re-offend in light of (1) her criminal history; (2) her commission of a similar crime while on bail; and (3) her past failed attempt at substance abuse treatment, as related to marijuana. These concerns are supported by the record. We conclude that the trial court gave appropriate consideration to the sentencing factors in arriving at its determination. Under these circumstances, we conclude that the trial court did not abuse its discretion in denying community corrections. See State v. Boston, 938 S.W.2d 435, 439 (Tenn. Crim. App. 1996).

Accordingly, we conclude that the trial court properly denied alternative sentencing in this case.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE